## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT ROGERS, | ) | CASE NO. 1:18CV1629 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Scott Rogers, ("Plaintiff" or "Rogers"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").[2]  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be VACATED and the case REMANDED for further

consideration consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government. *See* General Order 2018-15. The stay
was thereafter extended pursuant to General Order 2019-1. As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

1

# I.   PROCEDURAL HISTORY

In January 2016, Rogers filed an application for SSI, alleging a disability onset date of September 30, 2014 and claiming he was disabled due to autism, ADHD, anxiety, and depression.  (Transcript ("Tr.") 10, 155, 191.)  The applications were denied initially and upon reconsideration, and Rogers requested a hearing before an administrative law judge ("ALJ").  (Tr. 10, 105-107, 111-112, 115.)

On August 11, 2017, an ALJ held a hearing, during which Rogers, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 27-74.)  On December 6, 2017, the ALJ issued a written decision finding Rogers was not disabled.  (Tr. 10-26.)  The ALJ's decision became final on May 15, 2018, when the Appeals Council declined further review.  (Tr. 1-6.)

On July 16, 2018, Rogers filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 13, 14.)  Rogers asserts the following assignment of error:

    (1)      The ALJ did not properly consider the medical opinions of treating psychiatrist George Tesar, M.D.

(Doc. No. 12 at 8.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Rogers was born in February 1980 and was 37 years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 20.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has at least a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a drafter, telephone solicitor, bank

2

teller, and store laborer.  (*Id.*)

**B.     Relevant Medical Evidence[3]**

On July 22, 2011, Rogers underwent a neuropsychological evaluation with Darlene Floden, Ph.D., due to suspicion of attention deficit hyperactivity disorder ("ADHD").  (Tr. 238-240.)  He described early problems with hyperactivity and inattention, as well as difficulty interpreting social cues.  (Tr. 238.)  Rogers also reported that, at age 11, he exhibited "major anger issues," was diagnosed with depression and/or anxiety, and was treated with Zoloft.  (*Id.*)  He graduated high school with a 1.97 GPA and attended community college for two years.  (Tr. 239.)  While attending college classes, he worked part time as a bank teller where he "made mistakes and forgot procedures."  (*Id.*)  Rogers then transferred to New York Institute of Technology, where it took him another 5 years to obtain his bachelors degree in architecture.  (*Id.*)

On examination, Dr. Floden noted as follows: "His interpersonal manner was initially withdrawn but he became more interactive as the interview progressed.  During testing, he was friendly and cooperative.  Mood appeared mildly dysthymic and he demonstrated a normal range of affect.  Speech was fluent and without evidence of significant word finding difficulties.  Comprehension for general conversation and test instructions appeared to be intact.  He was able to provide details of his history in a clear and coherent manner and demonstrated good recall of recent and remote events."  (Tr. 239.)  Dr. Floden concluded Rogers' general intellectual abilities were in the average range but noted he showed evidence of poor concentration, problems with

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

concept formation and problem solving, perseverative response tendencies, and "mild retrieval problems with unorganized verbal information and poor memory monitoring." (*Id.*)  She further indicated that Rogers' responses to standardized questionnaires "suggest a person with significant thinking and concentration problems, marked depressive experiences, social isolation and estrangement, unusual preoccupation with physical functioning, hypervigilance and suspiciousness in his relations with others, and problematic levels of anxiety." (Tr. 240.)

Dr. Floden found that "formal neuropsychological evaluation revealed evidence of frontal dysfunction in the context of otherwise intact cognitive and motor skills." (*Id.*)  She concluded that "while some aspects of his history seem consistent with a diagnosis of ADHD, other elements of his behavior and presence of long-standing psychiatric diagnoses may be indicative of other developmental issues." (*Id.*)  Dr. Floden recommended Rogers consult with psychiatry and neurology. (*Id.*)

On September 16, 2011, Rogers presented to neurologist Sumit Parikh, M.D., for evaluation of "long standing history of sleep problem, anxiety issues, difficulty with memory and concentration, [and] keratoconus." (Tr. 247-250.)  On examination, Dr. Parikh noted poor eye contact and slow speech with an initially "slow" mental status. (Tr. 249.)  He found Rogers' problems included, among other things, ADD/ADHD, anxiety/depression, and difficulty with creating friendships. (*Id.*)  He concluded "it is difficult to assess at this point if his symptoms are solely due to his underlying psychiatry illness or has some underlying genetic component contributing as well." (Tr. 250.)  Dr. Parikh also suggested Rogers might have underlying high-functioning autistic spectrum disorder. (*Id.*)  He referred Rogers to psychology and psychiatry. (*Id.*)

4

Several years later, on July 1, 2014, Rogers underwent an initial psychiatric evaluation with George Tesar, M.D.  (Tr. 299-304.)  He stated he had been employed as a draftsman since January of that year, and was concerned he was slow and making mistakes at work "because of failure to pay attention."  (Tr. 299.)  Rogers also reported a history of anxiety, depression, and sleep disturbance.  (Tr. 300.)  His medications included Adderall and Fluoxetine (i.e., Prozac).  (*Id.*)  On mental status examination, Rogers was cooperative and agreeable with good eye contact but an anxious, avoidant/hesitant posture with the appearance of temporal muscle wasting.  (Tr. 300-301.)  His behavior was calm but awkward, and his movements were stiff, hesitant, and slow.  (*Id.*)  Dr. Tesar also found Rogers had an anxious mood; an anxious, constricted and blunted affect; and slow, irregular, halting speech.  (Tr. 301.)  Rogers' cognition was intact, his judgment was appropriate, and his insight was fair.  (*Id.*)  Dr. Tesar diagnosed autism spectrum disorder; executive function disorder contributing to appearance of ADHD; schizoid personality traits; and non-verbal learning disability.  (*Id.*)  He assessed a Global Assessment of Functioning[4] ("GAF") of 60, indicating moderate symptoms; and increased Rogers' Adderal dosage.  (Tr. 301-302.)

On September 29, 2014, Rogers returned to Dr. Tesar with continued complaints of memory impairment at work.  (Tr. 305-309.)  Dr. Tesar noted it was "difficult to understand

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

exactly what compromised his work, in part because of its complexity (or his description of it which was hard to follow) [but] whatever it is, i.e., the deficit, is longstanding and unresponsive, or only partially responsive to typical treatment for ADHD." (Tr. 305.)  Mental status examination findings were the same as Rogers' previous visit. (Tr. 305-306.)  Dr. Tesar found Rogers' "problem was not fully explained by ADHD" and concluded "the bottom line is that [the medication] he's taking now may be the best we can do." (*Id*.)  He assessed a GAF of 58 indicating moderate symptoms, and advised Rogers to continue on his current medication regimen. (Tr. 307.)

The following month, Rogers underwent a psychological/developmental examination with Leslie Markowitz, Psy.D., at the Cleveland Clinic Center for Autism. (Tr. 253-270.) Rogers' mother also attended and provided some historical context. (*Id*.)  Specifically, Mrs. Rogers reported that Rogers showed difficulty concentrating and communicating from an early age. (Tr. 253-254.)  She also noted Rogers experienced difficulties with peer interactions throughout childhood. (Tr. 254.)  Rogers himself reported deficits in language, communication, social skills, and following instructions. (Tr. 255.)  He also complained of "difficulties with being nervous, self-conscious, worrying, not having friends, preferring to be alone rather than with others," decreased energy, and forgetfulness. (Tr. 257.)  Dr. Markowitz summarized her conclusions as follows:

> Scott presents with a history of difficulties with social communication and social interaction difficulties. He struggles with reciprocal interactions and conversations with others and prefers to be alone. He has a history of difficulties with eye contact, using gestures, and  pointing when younger to supplement his speech. Scott continues to struggle with these during adulthood, as well as understanding others' non-verbal behaviors through reading their body language and facial expressions. Scott has a longstanding history of difficulties with developing and maintaining interactions with others as well. He does not have a history of repetitive motor

6

mannerisms or adherence to inflexible routines, or struggles with transitions. Scott displays some intense interests, such as being highly interested in wrestling when younger, and more recently in pets. He also displays some sensory sensitivities and preferences (e.g.,  over-sensitivity to heat/cold, sounds, touch, and light). These difficulties have been present since he was very young, and are causing significant difficulties across environments (e.g., home and work). Thus, the data obtained for this evaluation combined with reported history and current presentation consistently support a diagnosis of Autism Spectrum Disorder.

(Tr. 258-259.)  Dr. Markowitz diagnosed the following: (1) autism spectrum disorder, without intellectual impairment; with accompanying language impairment (social pragmatic); requiring support for deficits in social communication; requiring support for restricted, repetitive behaviors; (2) ADHD, predominantly inattentive presentation; and (3) anxiety and depression symptoms with a heavy somatic focus and decreased initiation behavior.  (Tr. 259.)  She concluded Rogers would "benefit from pursuing employment with an agency that understands his strengths and weaknesses (e.g., slower processing, trouble with social engagement/interaction), thus allowing him to be successful."  (*Id*.)  Dr. Markowitz further found Rogers "would benefit from a position where expectations were clear and not abstract; for instance, directing him to pick between a few options when working on an architecture project to ensure that he understands the expectation."  (Tr. 259-260.)

On November 25, 2014, Rogers returned to Dr. Tesar for follow up.  (Tr. 310-314.)  Dr. Tesar noted that Rogers' "current [medication] regimen is optimal" and found that "in general, things are stable."  (Tr. 310.)  Rogers expressed a desire to return to architecture work but "seem[ed] to have difficulty accepting his limitation– too slow at work."  (*Id*.)  Dr. Tesar encouraged him to "create realistic expectations for himself."  (*Id*.)  On examination, Rogers was cooperative and agreeable with an anxious facial expression, good eye contact, and the appearance of temporal muscle wasting.  (Tr. 311.)  His behavior was calm but awkward and his

7

movements were "stiff, hesitant to initiate, but once he starts talking it's occasionally difficult to cut in." (*Id*.)  Dr. Tesar also found Rogers had an "okay" mood; an anxious, constricted and blunted affect; and "normal to fast," irregular, halting speech.  (*Id*.)  Rogers' cognition was grossly intact, his judgment was appropriate, and his insight was fair.  (Tr. 311-312..)  Dr. Tesar assessed a GAF of 65, indicating mild symptoms; and advised Rogers to continue on his medications.  (Tr. 312.)

The record reflects Rogers did not return to Dr. Tesar until a year and a half later, on March 9, 2016.  (Tr. 315-319.)  Rogers reported he had moved to New York City and worked with a one-man architect business, but "was too slow" and "was only there a couple days."  (Tr. 315.)  He stated he came back to Cleveland in September 2015 and was applying for disability. (*Id*.)  Mental status examination findings were the same as his previous visit in November 2014. (Tr. 316.)  Dr. Tesar diagnosed autism spectrum disorder; ADHD, inattentive type; general anxiety disorder; delayed sleep-phase syndrome; schizoid personality traits; and non-verbal learning disability.  (Tr. 316-317.)  He assessed a GAF of 58 indicating moderate symptoms, reduced Rogers' Adderall dosage, and referred him for an occupational therapy evaluation.  (*Id*.)

Rogers returned to Dr. Tesar on August 10, 2016.  (Tr. 345-347.)  He stated he had "noticed" the reduction in Adderall and requested an increase in dosage.  (Tr. 345.)  His mother indicated she had "noticed some worsening of [his] organizational skills and follow-through when the dose was lowered."  (*Id*.)  Dr. Tesar declined to increase the dosage, finding "it's best to stay at the current dose and take drug holiday to address putative tolerance rather than compounding the problem by increasing."  (*Id*.)  Mental status examination findings were the same as his previous visits.  (Tr. 345-346.)  Dr. Tesar assessed a GAF of 56 indicating moderate

8

symptoms, and continued Rogers on his medications. (Tr. 347.)

On that same date, Dr. Tesar completed a questionnaire regarding Rogers' mental functioning, entitled "Medical Statement Regarding Autism and Related Disorders." (Tr. 321-322.) He concluded Rogers had qualitative deficits in reciprocal social interactions, verbal and nonverbal communication, and imaginative activity; and marked restrictions in his repertoire of activities and interests, activities of daily living, social functioning, and concentration, persistence, and pace. (*Id.*) Dr. Tesar further found Rogers was markedly limited in his abilities to: (1) remember locations and work-like procedures; (2) understand and remember short and simple instructions; (3) understand, remember, and carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) work in coordination with and proximity to others without being distracted by them; (7) make simple work-related decisions; (8) complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (9) ask simple questions or request assistance; (10) accept instructions and respond appropriately to criticism from supervisors; (11) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (12) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (13) set realistic goals or make plans independently of others. (*Id.*) In the comments section of the questionnaire, Dr. Tesar stated "patient has made repeated good-faith, but unsuccessful, efforts to work in his chosen field." (Tr. 322.)

On September 20, 2016, Rogers presented to Jonathan Klarfeld, M.D., for a preventative

health exam.  (Tr. 360-370.)  He complained of difficulty with memory, particularly "learning new things and includes manual labor practices as well. However, the latter is less problematic." (Tr. 360.)   Rogers also reported difficulty waking in the morning, as well as occasional double vision.  (Tr. 362.)  Examination findings were normal.  (Tr. 362-363.)

Rogers returned to Dr. Tesar on November 23, 2016.  (Tr. 371-377.)  He again expressed concern that the current dose of Adderall was not as effective.  (Tr. 371.)  On examination, Rogers was cooperative and agreeable with an anxious facial expression and good eye contact. (Tr. 372.)  His behavior was calm but awkward and his movements were appropriate.  (*Id*.)  Dr. Tesar also found Rogers had an "okay" mood; euthymic, constricted and blunted affect; and irregular, halting speech.  (*Id*.)  Rogers' cognition was grossly intact, and his judgment and insight were appropriate.  (Tr. 373.)  Dr. Tesar assessed a GAF of 60 indicating moderate symptoms, and adjusted Rogers' Adderall dosage.  (*Id*.)

On May 31, 2017, Rogers returned to Dr. Tesar with complaints of decreased energy, which he attributed to the change in his Adderall dosage.  (Tr. 383-392.)  Dr. Tesar advised "some form of regular aerobic exercise" and recommended a reduction in his Fluoxetine dosage. (Tr. 383.)  Examination findings were largely the same as his previous visit, with the exception of an anxious (as opposed to euthymic) affect.  (Tr. 385.)  Dr. Tesar assessed a GAF of 60, indicating moderate symptoms.  (Tr. 386.)

On August 10, 2017, Dr. Tesar completed an "Off Task/Absenteeism Questionnaire." (Tr. 403.)  He concluded Rogers was likely to be off task at least 20% of the workday due to "frequent difficulty remembering or fully comprehending instructions."  (*Id*.)  Dr. Tesar also opined Rogers would be absent from work about four times per month as a result of impairments

or treatment.  (*Id.*)

On that same date, Dr. Tesar completed a "Medical Statement concerning Depression, Bipolar, and Related Disorders."  (Tr. 404.)  He identified diagnoses of autism spectrum disorder, ADHD, and anxiety.  (*Id.*)  Dr. Tesar further indicated Rogers suffered from depressive disorder characterized by depressed mood, decreased energy, and difficulty concentrating or thinking. (*Id.*)  He opined Rogers had marked limitations in (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace at tasks; and (4) adapting or managing himself.  (*Id.*)  Finally, Dr. Tesar concluded Rogers' disorder was "serious and persistent" and there was evidence of both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and diminishes the symptoms of his mental disorder; and (2) marginal adjustment, i.e., minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.  (*Id.*)

## C.    State Agency Reports

On February 8, 2016, Rogers underwent a consultative examination with psychologist Herschel Pickholtz, Ed.D.  (Tr. 289-297.)  He stated he was being treated for ADHD, anxiety, and depression, and had been given a diagnosis of autism.  (Tr. 290.)  Rogers indicated he experienced (1) moderate depression "once a month lasting 2 days per occurrence," and (2) mild anxiety symptoms once per month lasting 2 days per occurrence.  (Tr. 291.)  He also stated that his autism causes communication problems, including "trouble expressing himself and understanding social situations."  (Tr. 292.)  On mental status examination, Dr. Pickholtz found Rogers was oriented to time, place and person with appropriate eye contact; constricted affect; "a little bit sluggish and slow" psychomotor activity; logical, coherent, relevant and goal directed

11

thought content; and "low average" capacities for associative thinking and cognitive levels of functioning.  (Tr. 293-294.)  He noted Rogers did not appear to have difficulty understanding and responding to questions during the evaluation, and found his pace and persistence fell within the average range.  (Tr. 293.)  Dr. Pickholtz concluded Rogers' estimated level of intelligence fell within the low average range, as did his capacity to recall a sequence of numbers.  (Tr. 294.)

Dr. Pickholtz diagnosed (1) a history of autism-spectrum disorder; (2) unspecified depressive disorder, in partial remission, mild; (3) attention-deficit/hyperactivity disorder, predominantly inattentive, mild to moderate; and (4) unspecified anxiety disorder, mild.  (Tr. 295-296.)  In terms of the four broad areas of mental functioning, Dr. Pickholtz found Rogers' "capacities to understand, remember, and carryout instructions for unskilled and skilled labor appears to be slightly impaired at worst."  (Tr. 296.)  In terms of attention, concentration, persistence, and pace, Dr. Pickholtz found Rogers' "abilities to perform 1 to 3-step tasks comparable to the type of work he did in the past appears to be somewhat impaired at worst but not preclusive of work."  (*Id.*)  He further concluded Rogers' "current levels of social interaction appear to be somewhat impaired at worst as long as he stays on his current medications."  (*Id.*)  Finally, in terms of his ability to respond to work pressures, Dr. Pickholtz found Rogers' "overall abilities to handle his daily demands and expectations . . . is somewhat impaired at worst but not preclusive of work and he needs a position which does not require a lot of detail and high levels of attention and concentration."  (*Id.*)  He further found Rogers "would do better in a position which did not require a significant amount of social interaction with others."  (*Id.*)

On February 24, 2016, state agency psychologist Paul Tangeman, Ph.D., reviewed Rogers' records and completed a Psychiatric Review Technique ("PRT") and Mental Residual

Functional Capacity ("RFC") Assessment.  (Tr. 83-87.)  In the PRT, Dr. Tangeman found Rogers

was moderately limited in his activities of daily living and in maintaining social functioning and

concentration, persistence, and pace.  (Tr. 83.)

In the Mental RFC, he concluded Rogers had moderate limitations in his abilities to: (1)

understand, remember, and carry out detailed instructions; (2) maintain attention and

concentration for extended periods; (3) work in coordination with or in proximity to others

without being distracted by them; (4) complete a normal workday and workweek without

interruptions from psychologically based symptoms and perform at a consistent pace without an

unreasonable number and length of rest periods; (5) interact appropriately with the general

public; (6) accept instructions and respond appropriately to criticism from supervisors; (7)

respond appropriately to changes in the work setting; and (8) set realistic goals or make plans

independently of others.  (Tr. 84-86.)  In the narrative sections of the form, Dr. Tangeman

explained as follows:

> [Due to] the claimant's ADHD, he would need detailed instructions written out for
> him.  * * *  The claimant is able to complete simple repetitive tasks.  He would do
> best in a work environment that does not require a lot of detail or high levels of
> attention and concentration. * * * The claimant reported that he has no friends and
> only interacts with his family he lives with.  At past jobs, his relationships with other
> coworkers was superficial.  The claimant would do best with superficial interaction
> with other coworkers and supervisors. * * * The claimant relies on family for things
> like grocery shopping, cooking and laundry.  He may need extra assistance in setting
> realistic goals. He would do best in a static work environment with little change.

(*Id*.)

On March 30, 2016, state agency psychologist Cynthia Waggoner, Psy.D., reviewed

Rogers' medical records and completed a PRT and Mental RFC Assessment.  (Tr. 96, 98-100.)

Dr. Waggoner reached the same conclusions as Dr. Tangeman.  (*Id*.)

13

D.        **Hearing Testimony**

During the August 11, 2017 hearing, Rogers testified to the following:

- He lives with his mother, father, and younger brother.  (Tr. 37-38.)  He attended college at Lakeland Community College, and later earned his college degree in architecture from the New York Institute of Technology.  (Tr. 38-39.)  It took him eight to ten years to get his degree.  (*Id.*)  He had to retake several classes and then had to wait to take several others.  (Tr. 40.)

- He has previous work experience as a bank teller.  (Tr. 41.)  He was reduced to part-time hours in that position, in part, because he "wasn't doing the best of work."  (*Id.*) He had trouble remembering how to do things correctly, and "kept making mistakes."  (Tr. 42.)  He has also worked as a stocker at Pet Smart and Kmart.  (Tr. 43-45.)  In these positions, he got complaints about failing to do things correctly and taking too long to complete tasks.  (*Id.*)

- In 2014, he worked at an architectural firm for 9 months.  (Tr. 45-46.)  In this position, he did drafting, light filing, and some sales.  (Tr. 45-49.)  He stopped working there because "they didn't have much of a use for [him.]."  (Tr. 46.)  He had difficulty remembering how to do things correctly, and it took him too long to complete tasks.  (Tr. 46, 48.)

- He has had autism his whole life, and was formally diagnosed with that condition in 2014.  (Tr. 51.)  He has also been diagnosed with ADHD, anxiety, and bipolar disorder.  (Tr. 54.)  He is currently seeing a psychiatrist and is compliant with his medications.  (*Id.*)  He has trouble following instructions, and is socially awkward.  (Tr. 50-51.)  He also has delayed sleep syndrome.  (Tr. 53.)

- He thinks he would have difficulty working because of the following problems: "Not doing things right.  Taking too long. People have to tell me over and over again."  (Tr. 50.)  Nonetheless, he thinks he might be able to work "under the right circumstances."  (*Id.*)

- He has never lived on his own.  (Tr. 52.)  His mother and father help him "navigate life." (Tr. 56.)  His mother organizes his things and makes sure he gets to doctor appointments.  (Tr. 55.)  On a typical day, he helps out around the house, watches television, and listens to music.  (Tr. 50.)  He does not have a girlfriend and does not have any friends.  (Tr. 52-53.)

Rogers' mother also testified during the hearing, as follows:

- She helps Rogers get through the day.  (Tr. 64.)  She has to remind him to shower, eat, and go to bed.  (*Id.*)  He is OCD and "hyperfocused."  (Tr. 63.)

14

> Even where instructions are written down for him, he is unable to complete the task correctly.  (*Id.*)  She does not believe Rogers can do simple, repetitive work because he gets "sidetracked, lost."  (Tr. 63-64.)

- When he has had jobs, Rogers has had problems understanding what was expected of him and completing tasks on a timely basis.  (Tr. 59.)  He is easily side-tracked and "veers off."  (*Id.*)  He lost his drafting job because he "couldn't remember what he was supposed to do" and took "way too long to do everything."  (Tr. 62.)

- When he attended college in New York City, Rogers lived with his uncle.  (Tr. 61-62.)  His uncle made sure Rogers remembered to eat and sleep.  (*Id.*)  In that sense, it was a "protected environment" for him.  (*Id.*)  Rogers had no friends in New York and was "stuck in his own little world."  (Tr. 60.)

- In addition to his autism, Rogers has vision problems relating to a cornea transplant in his right eye.  (Tr. 65.)  He has also been diagnosed with delayed sleep syndrome, which causes him to lack energy.  (*Id.*)

The VE testified Rogers had past work as a (1) drafter (sedentary but performed as medium, skilled, SVP 6); (2) telephone solicitor (sedentary but performed as medium, semi-skilled, SVP 3); (3) bank teller (light but performed as heavy, skilled, SVP 5); and (4) stores laborer (medium but performed as heavy, unskilled, SVP 2).  (Tr. 66-67.)  The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual the same age, education and work experience as the claimant. Further assume that this individual is limited as follows.  This is a non-exertional hypothetical with the following additional limitations.  This individual can perform simple, routine tasks and for more complicated tasks, must receive detailed instructions for the more complicated tasks.  This individual cannot work in an environment with production rate pace requirements. This person can have occasional interaction with supervisors, coworkers and the public and can tolerate routine workplace changes.  Can this individual perform any of the past jobs  that Mr. Rogers performed?

(Tr. 67.)

The VE testified the hypothetical individual would be able to perform Rogers' past work as a stores laborer, but would not be able to perform any of his other past work.  (Tr. 67.)  The

15

VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as laundry worker II (medium, unskilled, SVP 2); waxer (medium, unskilled, SVP 2), and automobile detailer (medium, unskilled, SVP 2).  (Tr. 68.)

The ALJ then asked the VE the following:

Q:      Based on your experience, training and education, what is the employer's tolerance for time off task and absences in an unskilled employment?

A:      In regard to absences, no more than one absence per month on an ongoing basis.  I would also include arriving late and leaving early as part of that. In regard to being off task, for unskilled work, we're talking no more than 10 percent off task in an eight-hour workday excluding the standard break periods.

Q:      Based on your testimony, an individual in Hypothetical One, if that individual were  to be either absent for more than one day per month or off task for more than 10 percent of the time, this individual would not be able to maintain full-time employment, is that correct?

A:      That is correct.

(Tr. 68-69.)

## III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial

16

gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since January 5, 2016, the application date (20 CFR 416.971 et seq.).

2.      The claimant has the following severe impairments: autism, depressive disorder and attention deficit disorder/attention deficit hyperactivity disorder (ADD/ADHD) (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

17

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:   He can perform simple routine tasks and for tasks that are more complicated, there must be detailed written instructions.  There should be no production rate pace requirements.  He can have occasional interaction with supervisors, coworkers and the public.  He can tolerate routine workplace changes.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on February ** 1980 and was 35 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since January 5, 2016, the date the application was filed (20 CFR 416.920(g)).

(Tr. 10-22.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

18

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

     Review of the Commissioner's decision must be based on the record as a whole.  *Heston*

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are

not subject to reversal, however, merely because there exists in the record substantial evidence to

support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion,

the decision of the Administrative Law Judge must stand if the evidence could reasonably

support the conclusion reached.")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

     In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Treating Physician Dr. Tesar

In his sole assignment of error, Rogers argues remand is required because the ALJ failed to articulate "good reasons" for assigning little weight to Dr. Tesar's August 2017 opinions. (Doc. No. 12 at 8-12.)  In particular, Rogers objects to the ALJ's determination that Dr. Tesar's opinions regarding off task behavior and absenteeism were "speculative" and based on subjective reports.  (*Id*.)  Rogers argues the decision is ambiguous, asserting the ALJ failed to identify the basis for this conclusion or otherwise provide any further explanation for his determination that Dr. Tesar's opinions on these issues were based on Rogers' subjective complaints.  (*Id*.)

20

The Commissioner argues the ALJ properly evaluated Dr. Tesar's August 2017 opinions and provided several "good reasons" for rejecting them.  (Doc. No. 13 at 6-13.)  She asserts that, reading the decision as a whole, the ALJ adequately supported his conclusion that Dr. Tesar's opinions were not consistent with Rogers' functioning, noting evidence that Rogers was able to shop, drive, live with others, watch television, follow instructions from healthcare providers, describe his work history, obtain a college degree, and interact with others.  (*Id*. at 7.)  The Commissioner further maintains the ALJ properly rejected Dr. Tesar's opinions as speculative and based on Rogers' subjective reports, noting Dr. Tesar's mental status examinations and diagnoses remained unchanged during the relevant time period.  (*Id*. at 8.)  Finally, the Commissioner argues the ALJ gave great weight to the opinions of Drs. Markowitz, Pickholtz, Tangeman and Waggoner and adopted limitations in the RFC that were consistent with these opinions.  (*Id*. at 8-9.)

In reply, Rogers argues the Commissioner's Brief "contains a fair deal of *post hoc* rationale."  (Doc. No. 14.)  He notes the ALJ did not cite the contents of Dr. Tesar's treatment notes or the other opinions of record as a basis for discounting the August 2017 opinion.  (*Id*.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5]  However, "a finding

---

[5] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).  As Rogers filed his application in January 2016, the Court applies the regulations in effect at that time.

that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[6]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*,

---

[6] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are

23

'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, Dr. Tesar completed two opinions dated August 10, 2017.[8]  (Tr. 403-404.)  In the first, titled "Off Task/Absenteeism Questionnaire," he concluded Rogers was likely to be off task at least 20% of the workday due to "frequent difficulty remembering or fully comprehending instructions."  (Tr. 403.)  Dr. Tesar also opined Rogers would be absent from work about four times per month as a result of impairments or treatment.  (*Id.*)

In the second opinion, titled "Medical Statement concerning Depression, Bipolar, and Related Disorders," Dr. Tesar identified diagnoses of autism spectrum disorder, ADHD, and anxiety.  (Tr. 404.)  He further indicated Rogers suffered from depressive disorder characterized by depressed mood, decreased energy, and difficulty concentrating or thinking.  (*Id.*)  Dr. Tesar opined Rogers had marked limitations in (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace at tasks; and (4) adapting or managing himself.  (*Id.*)  Finally, Dr. Tesar concluded Rogers' disorder was "serious and persistent" and there was evidence of both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and diminishes the symptoms of his mental disorder; and (2) marginal adjustment, i.e., minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.  (*Id.*)

---

[8] As noted *supra,* Dr. Tesar also submitted an opinion in August 2016.  Rogers does not challenge the ALJ's evaluation of this opinion and, therefore, the Court will not limit its analysis to the ALJ's evaluation of Dr. Tesar's August 2017 opinions.

24

The ALJ evaluated this opinion as follows:

> Dr. Tesar completed an Off-Task/Absenteeism Questionnaire and Medical Statement Concerning Depression, Bipolar, and Related Disorder on August 10, 2017 (Exhibit 13F). Dr. Tesar opined the claimant would be off-task 20% of the time. He has frequent difficulty remembering or fully comprehending instructions. Due to his impairments or treatments, he would be off work about four times a month. The claimant was diagnosed with autism spectrum disorder, ADHD, and anxiety. Depressive symptoms include depressed mood, decreased energy, and difficulty concentrating or thinking. Dr. Tesar opined he had marked limitations in understanding, remembering or applying information; interacting with others; concentration, persistence or pace; and, adapting or managing oneself He has the minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. **I assigned little weight to this opinion because it is inconsistent with the claimant's functioning. The claimant does not meet the listing, he has a college degree, he was able to live away from home, he has some difficulty social around others, but he is otherwise able to interact with others, he is persistent and able to complete tasks, albeit, in more time than other individuals. I am not giving the absenteeism and off task opinions, great weight because they are speculative and they are based on subjective reports rather than objective testing.**

(Tr. 18-19) (emphasis added). The ALJ formulated the following RFC: "After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can perform simple routine tasks and for tasks that are more complicated, there must be detailed written instructions. There should be no production rate pace requirements. He can have occasional interaction with supervisors, coworkers and the public. He can tolerate routine workplace changes." (Tr. 14.)

For the following reasons, the Court finds the ALJ failed to articulate "good reasons" for rejecting Dr. Tesar's August 2017 opinions.[9] While the ALJ acknowledged Dr. Tesar's

---

[9] It is undisputed Dr. Tesar was Roger's treating psychiatrist at the time he authored his August 2017 opinions. As noted *supra*, Rogers established treatment with Dr. Tesar in July 2014. The record reflects Dr. Tesar examined Rogers seven (7) times between

opinions and articulated the amount of weight he accorded them, the Court finds the reasons

provided by the ALJ for discounting Dr. Tesar's August 2017 opinions are not supported by

substantial evidence.  The first reason provided by the ALJ is that Dr. Tesar's opinions are

"inconsistent with the claimant's functioning." (Tr. 19.)  In this regard, the ALJ relied on his

findings that Rogers "does not meet a listing,[10] he has a college degree, he was able to live away

from home, he has some difficulty social[ly] around others, but he is otherwise able to interact

with them, he is persistent and able to complete tasks, albeit, in more time than other

individuals."  (*Id*.)  As explained below, however, the ALJ's discussion of these specific

examples of Rogers' alleged functioning is incomplete and misleading.

   Although the record reflects Rogers did obtain a college degree, the ALJ fails to account

for evidence in the record regarding Rogers' struggles to obtain that degree and/or his

longstanding history of academic difficulties.  Rogers testified at the hearing that it took him

eight to ten years to obtain his bachelors degree due, in large part, to the fact that he failed

multiple classes.  (Tr. 38, 40.)  During his neuropsychological evaluation, Rogers reported he

often failed to complete college assignments and, due to his hypersomnia and delayed sleep

syndrome, frequently slept through classes.  (Tr. 239.)  Rogers' mother also testified regarding

Rogers' academic difficulties, explaining it took him "forever" to do his college classwork and

stating "he would do one project and get it halfway done and start all over again."[11]  (Tr. 60.)

_____

July 2014 and his August 2017 opinion.

[10] It is unclear why the fact that Rogers does not meet a listing is relevant to the ALJ's
 step four analysis of Dr. Tesar's medical opinion.  The ALJ provides no further
 discussion or explanation of this "reason."

[11] Mrs. Rogers further testified as follows: " Two days before he was supposed to
 graduate, the dean said he was not going to graduate, that he wasn't up to par. So . . . ,

26

This testimony is consistent with evidence in the record of Rogers' longstanding problems in school.  Specifically, treatment notes indicate Rogers had an IEP for at least a portion of elementary school, and graduated high school with a GPA of only 1.97.  (Tr. 239.)  The ALJ does not acknowledge or address this evidence in connection with his evaluation of Dr. Tesar's August 2017 opinions, rendering it difficult to understand how it is inconsistent with Dr. Tesar's opinions of marked limitations and off task behavior.

The ALJ's reliance on Rogers' alleged ability to live away from home is similarly misleading.  While it is true that Rogers moved to New York City for five years to attend college, the record reflects he lived with his uncle throughout this time period and, further, that his mother frequently visited for days at a time to take care of him.  (Tr. 60-61.)  Mrs. Rogers testified it was a "protected environment" for Rogers, explaining his uncle looked out for him and made sure he would remember to eat.  (Tr. 61-62.)  During the hearing, Rogers (who was 37 years old at the time of the hearing) testified that he has never lived alone.  (Tr. 52.)  Both Rogers and his mother explained that Rogers' parents help him "navigate life" by organizing his things, making sure he goes to doctor appointments, and reminding him to shower, eat, and go to bed. (Tr. 55-56, 64.)  Again, the ALJ fails to acknowledge or address this evidence in connection with his evaluation of Dr. Tesar's August 2017 opinions.

The ALJ also fails to paint a complete picture when he states that Rogers "is persistent

---

they let him walk on stage. He came home and for the rest of the summer, he . . . tracked down one of the professors that helped him along with my husband.  Had to redo that whole final project with my husband's help. That's how he got to graduate. * * * My feelings were, he had spent all this money, five years [at New York Institute of Technology], they didn't catch it.  Somehow they just let him slide through and got the degree.  It was such a struggle in five years."  (Tr. 61.)

and able to complete tasks, albeit, in more time that other individuals." (Tr. 19.) While, standing alone, this statement is accurate, the ALJ fails to acknowledge or address the plethora of evidence in the record that Rogers' inattention and inability to timely complete tasks has presented serious difficulties for him in the workplace. Rogers testified at the hearing that he lost many jobs over the years due to his failure to timely complete tasks and inability to remember how to do things correctly. (Tr. 41-45, 46, 48.) This testimony is reflected in his treatment notes as well. In July 2011, Dr. Floden noted Rogers' reports that he "made mistakes and forgot procedures" when working as a bank teller; after a thorough neuropsychological examination, Dr. Floden concluded Rogers suffered from frontal dysfunction. (Tr. 239, 240.) Several years later, Rogers began treatment with Dr. Tesar because he feared his job was in jeopardy due to the fact he was slow and making mistakes at work. (Tr. 299.) Dr. Tesar appeared to agree, noting in November 2014 that Rogers "seem[ed] to have difficulty accepting his limitation – too slow at work." (Tr. 310.) The record reflects Rogers nonetheless attempted to return to work at an architectural firm in 2015, but was fired for being "too slow." (Tr. 315.)

In sum, in evaluating Dr. Tesar's opinion, the ALJ failed to accurately characterize the evidence regarding Rogers' functioning and, further, failed to otherwise acknowledge or address evidence that potentially supported that opinion. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis). *See also Brownell v. Berryhill,* 2019 WL 497673 at * 14 (N.D. Ohio Feb. 8, 2019) (remanding where the ALJ decision "fails to acknowledge or address the medical evidence that potentially supports Dr. Stephens' opinion"); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 at * 4 (S.D. Ohio Dec. 13, 2016) ("This Court has not

hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").  Accordingly, and in light of the above, the Court finds the first reason provided by the ALJ is not supported by substantial evidence.

The second reason provided by the ALJ for discounting Dr. Tesar's August 2017 opinions is as follows: "I am not giving the absenteeism and off task opinions great weight because they are speculative and they are based on subjective reports rather than objective testing."  (Tr. 19.)  The ALJ does not provide any explanation of the basis for this conclusion. As Rogers correctly notes, Dr. Tesar does not indicate that his opinions on these issues are based on Rogers' subjective complaints.  Moreover, there is evidence in the record (including in Dr. Tesar's own treatment notes) documenting Rogers' difficulties with concentration, attention, and focus.  In July 2011, Dr. Floden noted evidence of poor concentration and "significant thinking and concentration problems," and assessed frontal lobe dysfunction.  (Tr. 239-240.)  Several years later, in July 2014, Dr. Tesar diagnosed executive function disorder contributing to appearance of ADHD, and increased Rogers' Adderall dosage.  (Tr. 301-302.)  In October 2014, Dr. Markowitz formally diagnosed Rogers with ADHD and autism.  (Tr. 259.)  Two years later, in August 2016, Rogers' mother reported to Dr. Tesar that Rogers' organizational skills and follow-through had deteriorated, despite medication.  (Tr. 345.)  Further, as discussed at length above, Dr. Tesar consistently documented a host of abnormal mental status examination findings, including anxious, avoidant/hesitant posture; temporal muscle wasting; stiff, hesitant and slow movements; anxious mood; an anxious, constricted and blunted affect; and slow, irregular, and halting speech.  (Tr. 300-301, 305-306, 311, 316, 346, 372-373, 385.)

The ALJ fails to discuss any the above evidence in the context of evaluating Dr. Tesar's

29

August 2017 opinions or otherwise explain how he believes Dr. Tesar's opinions are "speculative" in light of that evidence. The Sixth Circuit has made clear that an ALJ's conclusory and unexplained rejection of a treating physician opinion does not constitute a "good reason" for rejecting these opinions. *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.")*; Rogers*, 486 F.3d at 245–46 (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Patterson v. Astrue*, 2010 WL 2232309 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio Apr.23, 2012) (finding the ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported). As the ALJ herein fails to provide any explanation for his conclusion that Dr. Tesar's opinions were speculative and "based on subjective reports," the Court finds the second reason provided by the ALJ is not supported by substantial evidence.

The Commissioner nonetheless argues remand is not required because the ALJ discussed the medical evidence (including Dr. Tesar's treatment history with Rogers) earlier in

30

the decision. This argument is without merit. While the ALJ recited some of the medical evidence earlier in the decision, he failed to offer any meaningful *explanation* for his conclusion that Dr. Tesar's August 2017 opinions were inconsistent with that evidence. *See Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cassels v. Comm'r of Soc. Sec.*, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The ALJ, for example, 'does not offer any explanation for his conclusion' that 'the treating physician's opinions were inconsistent with the medical evidence,' which is enough by itself for error.")

Finally, the Commissioner asserts other record evidence is inconsistent with Dr. Tesar's opinions, including the opinions of Drs. Markowitz, Pickholtz, Tangeman and Waggoner. The Commissioner, however, cannot cure a deficient opinion by offering explanations that were not offered by the ALJ. As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn*, 2013 WL 3967282 at * 8; *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012). Here, the various arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for rejecting Dr. Tesar's August 2017 opinions. Accordingly, this Court rejects the Commissioner's *post hoc* rationalizations.

In sum, the Court finds the ALJ failed to set forth good reasons for rejecting Dr. Tesar's August 2017 opinions. As noted above, the ALJ failed to conduct a thorough, complete evaluation of the evidence and, indeed, failed entirely to acknowledge or address evidence that potentially supported Dr. Tesar's opinions. A district court cannot uphold an ALJ's decision,

even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877. Here, the ALJ's failure to sufficiently address the evidence discussed above results in the absence of an "accurate and logical bridge" between the evidence and her rejection of Dr. Tesar's August 2017 opinions, hampering this Court's ability to meaningfully review the decision.

Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to properly address the mental functional limitations assessed by Dr. Tesar therein.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 22, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**